UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
_____
AIM PARKING MANAGEMENT, LLC ,          )
      Plaintiff,                       )
                                       )
      v.                               )      Civil Action No. 09cv10033-NG
                                       )
MASSACHUSETTS BAY                      )
TRANSPORTATION AUTHORITY ,             )
      Defendant.                       )
_____)
```
GERTNER, D.J.

**MEMORANDUM AND ORDER RE: MOTION FOR SUMMARY JUDGMENT**
June 4, 2010

**I.     BACKGROUND**

AIM Parking Management, LLC ("AIM") is a parking lot management company.  In 2007, and again in 2008, AIM signed contracts with the Massachusetts Bay Transportation Authority ("MBTA") to manage park-and-ride lots at commuter rail stops around Massachusetts.[1]  Under the contracts, AIM managed the lots and the MBTA set the rates paid by parkers.  On October 16, 2008, the MBTA sent notice to AIM that it was increasing parking rates at all MBTA commuter rail parking facilities.  AIM responded by notifying the MBTA that the rate increase would "literally double[]" its management expenses.[2]  (Letter from Joshua A.

---

[1] The 2007 contract was entitled "Management Agreement Between Massachusetts Bay Transportation Authority and AIM Parking Management LLC for Management of MBTA Parking Facility Group #4" ("Group 4 Contract") and was executed on November 28, 2007.  (Ex. 5 to Def.'s Mem. in Support Mot. for Summ. J., document #9.)  The contract runs from December 1, 2007, to December 1, 2010, and the MBTA has the option to extend the contract's term for up to two years.  On January 31, 2008, AIM and the MBTA executed another contract for management of Parking Facility Group 8 ("Group 8 Contract").  (Ex. 11 to Def.'s Mem. in Support Mot. for Summ. J.)  This contract runs from February 1, 2008, to December 1, 2010, subject to the MBTA's option to extend the contract's term for up to an additional two years.  Both contracts are at issue in this case.  They are identical in all relevant respects.

[2] AIM claimed that, among other things, it would have to hire four additional employees to count and collect the additional fees. (Letter from Joshua A. Berlinsky, Counsel for Pl., to Def. (Oct. 29, 2008), Ex. 13 to Def.'s Mem. in Support Mot. for Summ. J.)

Berlinsky, Counsel for Pl., to Def. (Oct. 29, 2008), Ex. 13 to Def.'s Mem. in Support Mot. for Summ. J.)

AIM took the position that the MBTA's rate increase constituted a "Change Order" -- a written order making "additions, modifications, [or] improvements to the services to be provided by [AIM]." Paragraph 38(a) of the parties' contracts permits the MBTA to issue such orders as long as they do not "modify the overall purpose" of the parties' agreement. If the MBTA issues a Change Order, paragraph 38(c) provides that an "equitable adjustment" may be made to reflect any resulting increase or decrease in AIM's management costs. AIM sought a $407,424.00 increase in its annual management fee under this provision. (Id.) The MBTA rejected AIM's request, taking the position that its notice of rate increases did not constitute a Change Order because it did not "change[] . . . the scope of the services to be provided by AIM." (Letter from Ian Larrabee, Acting Director of Parking Services, MBTA, to William Herendeen, Vice President, AIM (Nov. 5, 2008), Ex. 14 to Def.'s Mem. in Support Mot. for Summ. J.)  Having been rebuffed by the MBTA, AIM filed this lawsuit.

## II.    STANDARD OF REVIEW

The MBTA has moved for summary judgment. "Summary judgment is appropriate if there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law." Hershey v. Donaldson, Lufkin & Jenrette Secs. Corp., 317 F.3d 16, 19-20 (1st Cir. 2003); see also Fed. R. Civ. P. 56(c). The relevant facts in this case are not disputed. (Pl.'s Opp. 3, document #13; Def.'s Mem. in Support Mot. for Summ. J. 9, document #9.) The only question is how the law applies to these facts.

**III.    ANALYSIS**

AIM brings two claims under Massachusetts law:[3] (I) unjust enrichment/quasi contract and (ii) breach of the implied covenant of good faith and fair dealing.

**A.    Unjust Enrichment/Quasi Contract**

AIM's claim of unjust enrichment, or "quantum meruit," falters from the start. "Recovery in quantum meruit presupposes that no valid contract covers the subject matter of a dispute.  Where such a contract exists, the law need not create a quantum meruit right to receive compensation for services rendered."  Boswell v. Zephyr Lines, Inc., 606 N.E.2d 1336, 1342 (Mass. 1993); see also MCI WorldCom Commc'ns, Inc. v. Dep't of Telecomms. & Energy, 810 N.E.2d 802, 812 (Mass. 2004) (holding that the DTE properly denied MCI's quantum meruit claim because "provisions of the express contract address the disputed issue").  As demonstrated below, AIM and the MBTA entered into valid contracts that contemplate the possibility of a rate hike.  Thus, AIM cannot recover on a theory of unjust enrichment or quantum meruit.

The relevant contractual provisions are as follows:[4]

1. "Parking rates . . . may be changed by the MBTA from time to time during the Term upon written notice to [AIM]."  (Group 8 Contract ¶ 3(d).)

2. AIM "shall be responsible to ensure that the proper parking fees are collected for all vehicles parked in the premises."  (Id. ex. A ¶ 2(H)(1).)

3. AIM "shall pay all expenses reasonably and actually incurred by it in the operation of the Parking Facility including, for example: wages for services of Contractor's employees working in the Parking Facility . . . . *[AIM] shall not be entitled to seek reimbursement from the MBTA for any of the expenses set forth in*

---

[3] There is no dispute about choice of law.  The Group 4 and Group 8 Contracts both provide that their terms are to be governed by Massachusetts law.  (Group 4 Contract ¶ 46(v); Group 8 Contract ¶ 46(v).)

[4] Both contracts contain identical provisions.  For ease of presentation, I cite only to the Group 8 Contract.

>    *the preceding sentence* unless any such expenses qualifies as a Reimbursable Expense pursuant to the provisions of Section 6 of the Scope of Work." (Id. ¶ 11(a) (emphasis added).)

4. The "Reimbursable Expenses" referred to in paragraph 11(a) consist of the expenses resulting from "[s]now removal"; "[r]eplacement of parking revenue control equipment and signage upon MBTA approval"; "[i]nstallation of new parking system equipment"; "[r]e-keying of locks"; and "[r]equired unanticipated . . . activities that are less than $500." "Reimbursable Expenses" also include any "[o]ther extraordinary expenses as approved in writing in advance by the MBTA." (Id. ex. A ¶ 6(A).)

The issue of adjusting parking rates is clearly addressed in the contract. AIM is responsible for ensuring the collection of parking fees and the payment of the collectors' wages. As required, the MBTA provided written notice of the rate change to AIM. (Letter from Ian Larrabee, Acting Director of Parking Services, MBTA, to William Herendeen, Vice President, AIM (Oct. 16, 2008), Ex. 12 to Def.'s Mem. in Support Mot. for Summ. J.) Moreover, AIM does not allege that the additional expenses it claims to have incurred as a result of the rate change qualify as "Reimbursable Expenses," as that term is defined in its contracts with the MBTA. Since AIM's dispute with the MBTA fits squarely within the four corners of the parties' contracts, its claim of unjust enrichment fails.[5] See Fay, Spofford & Thorndike, Inc. v. Mass. Port Auth., 387 N.E.2d 206, 209-10 (Mass. App. Ct. 1979).

### B. Implied Covenant of Good Faith and Fair Dealing

A covenant of good faith and fair dealing is implied in every contract governed by Massachusetts law. Anthony's Pier Four, Inc. v. HBC Assocs., 583 N.E.2d 806, 821 (Mass.

---

[5] AIM also attempts to rely on another basis for stating an unjust enrichment claim. "[P]arties may invoke the remedy of quantum meruit, that is, asking recovery for the fair value of services and materials, in the absence of a contract or *where the party furnishing services and materials, finding the contract is broken by the other party, disaffirms the contract and considers it at an end.*" Fay, Spofford & Thorndike, Inc. v. Mass. Port Auth., 387 N.E.2d 206, 209 (Mass. App. Ct. 1979). AIM, however, has not suggested that it considers its contracts with the MBTA to be "broken" or "at an end." The MBTA is quite clearly within its contractual right to change parking rates.

1991).  The covenant requires "that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  Druker v. Roland Wm. Jutras Assocs., Inc., 348 N.E.2d 763, 765 (Mass. 1976) (quoting Uproar Co. v. Nat'l Broad. Co., 81 F.2d 373, 377 (1st Cir. 1936)).  Breaches of the covenant are generally characterized by "deceit or 'unfair subterfuge' and usually are 'compounded by deceptive or unfair behavior that prevented - or at a minimum diverted - the injured parties from seeking immediate redress.'"  Christensen v. Kingston Sch. Comm., 360 F. Supp. 2d 212, 226 (D. Mass. 2005) (quoting Boston Pilots v. Motor Vessel Midnight Gambler & E. Coast Excursions, Inc., 357 F.3d 129, 135 (1st Cir. 2004)); see also Targus Group Int'l, Inc. v. Sherman, 922 N.E.2d 841, 853 (Mass. App. Ct. 2010) ("Usually, a breach of the implied covenant involves 'bad faith' conduct 'implicating a dishonest purpose, consciousness of wrong, or ill will in the nature of . . . fraud.'" (quoting Equip. & Sys. for Indus., Inc. v. Northmeadows Constr. Co., 798 N.E.2d 571, 575 (Mass. App. Ct. 2003)).

The undisputed facts, however, demonstrate that the MBTA did not engage in any underhanded or deceptive conduct.  The MBTA merely exercised its contractual right to change parking rates.  It is AIM, not the MBTA, that is trying to alter the allocation of contractual fruits.  In essence, it requests the Court to reform its contract with the MBTA to ensure that it receives its expected profit margin after the change in parking rates.  But if AIM wanted a contract that would cover its costs and provide a guaranteed profit, it should have bargained for such an agreement.  The implied covenant of good faith and fair dealing does not license courts to amend a contract merely because one of the contracting parties later decides that it struck a raw deal.  See Ayash v. Dana-Farber Cancer Inst., 822 N.E.2d 667, 684 (Mass. 2005) ("Th[e] implied

covenant may not be 'invoked to create rights and duties not otherwise provided for in the existing contractual relationship . . . .'" (quoting Uno Rests., Inc. v. Boston Kenmore Realty Corp., 805 N.E.2d 957, 964 (Mass. 2004)).  Since AIM presents no evidence to suggest that the MBTA was acting in bad faith in increasing parking rates, it cannot recover on its claim that the MBTA breached the implied covenant of good faith and fair dealing.  Cf. J.F. White Contracting Co. v. MBTA, 666 N.E.2d 518 (Mass. App. Ct. 1996) (rejecting plaintiffs' effort to obtain payment of overhead costs that the plaintiffs' contracts with the MBTA prohibited them from recovering).

## IV. CONCLUSION

Since the facts in this case are undisputed and the MBTA is clearly entitled to judgment as a matter of law on each of AIM's claims, the MBTA's Motion for Summary Judgment (**document #8**) is **GRANTED**

**SO ORDERED.**

**Date:   June 4, 2010**          /s/ Nancy Gertner
                          **NANCY GERTNER, U.S.D.C.**